In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1948

ADRIAN KERCIKU and NAJADA KERCIKU,

*Petitioners*,

*v.*

IMMIGRATION AND NATURALIZATION SERVICE,
and JOHN ASHCROFT, ATTORNEY GENERAL,

*Respondents*.

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A 76 858 597 & A 76 858 598.

ARGUED NOVEMBER 14, 2002—DECIDED JANUARY 3, 2003

Before RIPPLE, ROVNER, and DIANE P. WOOD, *Circuit Judges*.

PER CURIAM. Adrian Kerciku and his wife Najada, both Albanian nationals, applied for asylum, claiming that Albanian Communists had persecuted Mr. Kerciku for his pro-democracy political views and activities and that the couple feared for their lives should they have to return to Albania. At the removal hearing, after questioning Kerciku solely about documents that he had submitted to corroborate his claims, the Immigration Judge discredited his testimony and documentation, abruptly ended the hearing

without allowing any other testimony, and denied the
Kercikus' applications for asylum. The Kercikus petition for
review, arguing that they were improperly denied a full
hearing on the merits of their application. Because the
judge violated due process by not allowing the Kercikus to
present testimony to support their claims, we grant the
petition and remand for further proceedings.

### Facts

In his asylum application,[1] Kerciku stated that before
World War II, the Kerciku family was very prosperous
and well-known in Albania and owned much land in Tirana,
the capital city. According to Kerciku, the Communist re-
gime that came to power after the War confiscated the
family's holdings, targeted the Kercikus because of their
resistance to communism and their pro-democracy political
opinions, and sent male family members to prison and
the women and children to labor camps.

Kerciku, who was born in 1970, claims that the Alba-
nian government sent him to a labor camp at a very early
age simply because he belonged to the Kerciku family.
Over time, he learned to use tools skillfully and wished
to study mechanics at the university level. Kerciku learned,
however (the record does not reflect how), that the Alba-
nian secret police had a "strict order" prohibiting members
of the Kerciku family from continuing their education
past secondary school. Kerciku further claims that on a
number of occasions, the police "kicked around and beat"
him when he demanded to continue his education.

---

[1] Upon their own motion, the Kercikus' applications for asylum
were joined. Thus, Mrs. Kerciku's status depends upon the out-
come of her husband's application.

All of these experiences spurred Kerciku in 1990 to begin participating in pro-democracy demonstrations and associating with student activists. According to Kerciku, police arrested him during demonstrations in November 1990 and February 1991, interrogated him, beat him severely, threatened to kill him, and detained him each time for approximately two months. Kerciku claims that one beating left him unconscious for two days and another caused nerve damage that resulted in a permanent speech impediment. Both times upon his release, police ordered him not to participate in the pro-democracy movement.

Kerciku disobeyed these orders and began campaigning for the Albanian Democratic Party in 1991. When the Democratic Party won the 1992 elections, it hired him as a mechanic and chauffeur at the Albanian Foreign Ministry. Later, during the 1996 election campaign, Kerciku stated that he became the "personal chauffeur, guard and confidant" of Tritan Shehu, the Democratic Party's chairman and Foreign Minister. Kerciku claims that during this campaign, he began receiving death threats from members of the opposition Socialist Party. He further claims that after the 1996 elections, when he publicly criticized the Democratic Party for winning the election by fraud, the Socialists' threats "became more definite and certain." He detailed that in early 1997, Shehu "advised me that he was certain that my murder had been planned" and that he should marry Najada and leave Albania at once. With Shehu's assistance, Kerciku moved with his new wife to Holland to serve as a chauffeur at the Albanian embassy there.

After moving to Holland, Kerciku continued to receive death threats from sources identifying themselves as members of the Albanian Socialist Party. These threats and the Socialist Party's recapture of the Albanian government in 1997 convinced Kerciku and his wife to emi-

grate from Europe. After the couple came to the United States on visitor visas in late 1997, Kerciku applied for asylum, citing his past political persecution, the political chaos and violence in Albania, and his fear that the couple would be killed if they returned to Albania.

### The Removal Hearing

Before the Kercikus' removal hearing, Kerciku submitted several documents purporting to certify his past political persecution, his membership in various pro-democracy groups in Albania, his past arrests and injuries, and his employment at the Albanian Embassy in Holland. Although the INS withdrew its initial objection to the authenticity of the documents, the Immigration Judge opened the hearing by questioning Kerciku about how he obtained them. In response to the judge's questions, Kerciku testified that in December 1997 and January 1998 he asked his brother, who was still living in Albania, to obtain and send the documents to him in the United States. When the judge asked why some of the documents pre-dated December 1997, Kerciku responded that the Democratic Party may have recreated them after the originals were destroyed by fire. The judge also questioned him about the threats he received in Holland, pressing him at length for the exact number and dates and expressing surprise that he did not make a log of the threats.

Kerciku was then briefly examined by his own attorney about the source of the documents. Kerciku testified that when he lived in Holland, he had personally asked for one of the documents—the certification of embassy employment—from the central government in Albania. When the Kercikus' attorney finished his very brief examination, he noted that "we have much more to go in our case. . . . [t]his is not a major part of our case." But the

judge signaled that he was terminating the hearing by responding, "I'm afraid it will be." The Kercikus' attorney then offered to submit the documents to the Federal Documents Laboratory for authentication, as the INS had suggested earlier in the hearing, but the judge declined, citing the lack of other documents for comparison and noting that, in any event, the lab would not be able to explain inconsistencies in Kerciku's testimony.

At this point, before the Kercikus could present any testimony on their behalf, the judge rendered his decision. The judge noted various inconsistencies that he had perceived in Kerciku's testimony: the earlier dates on some of the documents, Kerciku's "implausible and incomprehensible" claim that he requested certification of employment from the central government in Albania rather than from the embassy itself, and his "evasive" testimony about the death threats in Holland. The judge stated that Kerciku's testimony was "incredible" and that based on the inconsistencies in the testimony, he believed the documents were fabricated. The judge concluded that "[Mr. Kerciku's] claim should not be credited in any material aspect," and that the "serious questions" regarding the documents' authenticity were "fatal to the [Kercikus'] case." Finally, the judge denied the Kercikus' applications for asylum and ordered them removed to Albania.

Both at the removal hearing and in oral argument before us, the Kercikus' attorney indicated that they had planned to have Kerciku testify about the long history of persecution that he had included in his application. They were also prepared to present testimony from an expert on Albanian affairs, Father Prenk Camaj, whose affidavit indicates that based on consultations with Albanian government officials, he could have substantiated Kerciku's claims of past persecution and the couple's fear of deadly harm if they returned to Albania.

The Kercikus appealed the judge's decision to the Board of Immigration Appeals (BIA), arguing that "the Judge deprived the respondent of due process by refusing him the opportunity to complete his own testimony or to present witnesses to corroborate his own testimony." Without responding to this argument, and in a very abbreviated decision, the BIA found that the judge determined correctly that the Kercikus did not qualify for asylum and dismissed their appeal.

## Analysis

The Kercikus do not ask us to review the denial of asylum on the merits. Rather, they focus on process and request a full removal hearing, arguing that the judge should have allowed them to present testimony from Mr. Kerciku and their expert witness. For its part, the INS glosses over this argument and urges us to defer to the judge's adverse credibility finding. We review the Kercikus' due process challenge *de novo*, as the question of whether an immigration hearing violates due process is purely a legal issue, *Nazarova v. INS*, 171 F.3d 478, 482 (7th Cir. 1999).

It is well-settled that foreign persons in the United States are entitled to due process. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Ambati v. Reno,* 233 F.3d 1054, 1061 (7th Cir. 2000). In the context of political asylum, due process requires, among other things, that an applicant receive "a meaningful opportunity to be heard." *Nazarova*, 171 F.3d at 482. Furthermore, Congress has codified an applicant's right to present evidence at his or her removal hearing. *See* 8 U.S.C. § 1229a(b)(4)(B) ("the alien shall have a reasonable opportunity . . . to

present evidence on the alien's own behalf . . . ."). And not receiving a meaningful opportunity to be heard is sufficient to require a new hearing. *See Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993) ("[P]rocedural errors are cured by holding a new hearing in compliance with due process requirements.").

Although what constitutes "a meaningful opportunity to be heard" is far from clear, we distinguish between two types of situations when analyzing due process challenges. In the first type of situation, the immigration judge limits the extent of some testimony or frequently interrupts the applicant's presentation. These limitations, however, do not violate due process because they serve to focus the proceedings and exclude irrelevant evidence. *See Roman v. INS*, 233 F.3d 1027, 1032 (7th Cir. 2000); *Iliev v. INS*, 127 F.3d 638, 643 (7th Cir. 1997); *Kuciemba v. INS*, 92 F.3d 496, 501-02 (7th Cir. 1996); *see also Aguilar-Solis v. INS*, 168 F.3d 565, 568-69 (1st Cir. 1999); *Mikhailevitch v. INS*, 146 F.3d 384, 391-92 (6th Cir. 1998). In the second type of situation, by contrast, the immigration judge violates due process by barring complete chunks of oral testimony that would support the applicant's claims. Most notably, in *Podio v. INS*, 153 F.3d 506, 507-08 (7th Cir. 1998), we held that an applicant's due process rights were violated during his deportation hearing because the judge did not allow him to testify about his experiences in prison in his home country or to present corroborating testimony from family members about his past persecution. *See also Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (remanding where the judge did not allow the applicant to testify about anything in his written application); *Shahandeh-Pey v. INS*, 831 F.2d 1384, 1390 (7th Cir. 1987) (remanding where the judge did not allow the applicant to present favorable evidence to rebut charges of criminal conduct).

The Kercikus' case falls within this second category. The judge did not just interrupt their presentation or limit *some* of the testimony that they wanted to present. Rather, the judge did not allow the Kercikus to make any presentation—virtually the only testimony that the judge received was his own questioning of Kerciku about the source of his documentation and the death threats that he allegedly received in Holland. Much like the case in *Podio*, the judge "took over the questioning, so that in the end the judge, rather than the attorney, had elicited whatever testimony [the applicant] was able to give," 153 F.3d at 510. Similar to *Podio* again, the judge did not permit the testimony of the Kercikus' expert, whose affidavit indicates that he would have corroborated Kerciku's claims of past persecution, as well as the couple's fear that they would be killed if they returned to Albania. And similar to *Colmenar*, the judge made up his mind about the case and was subsequently unwilling to listen to any testimony from Kerciku about the claims in his written application (e.g., being sent to a labor camp as a child, not being allowed to attend university, being beaten severely and held for months at a time, receiving death threats before he left for Holland). Thus, this case presents a situation in which the immigration judge excluded so much of the Kercikus' proposed testimony that he violated their due process rights.

To find a due process violation, however, we also require an applicant to show that he or she was prejudiced by the judge's refusal to hear the testimony of the witnesses, "i.e., that the testimony he sought to introduce 'had the potential for affecting the outcome of . . . deportation proceedings.'" *Podio,* 153 F.3d at 511 (quoting *Kuciemba,* 92 F.3d at 501). Here, the Kercikus' attorney indicated that before the judge refused to hear any further testimony, they had planned to have Kerciku take the witness stand to testify about his experiences

in Albania and to have their expert corroborate these experiences and the danger the Kercikus would face if they returned to Albania. *See id.* (finding prejudice where the applicant was not allowed to present corroboration testimony). Even if the judge's negative credibility determination weighed against the Kercikus' application, the testimony that they wished to present still had the "potential" to affect the outcome of the hearing. *See Shahandeh-Pey*, 831 F.2d at 1389 (finding that rebuttal evidence would have had a "potential" effect on the outcome even though the INS had already presented evidence of the applicant's numerous criminal convictions). For example, the testimony could have been so compelling and consistent that it would have altered the judge's initial credibility determination and overall view of the case. The judge's refusal to hear testimony that formed the heart of the Kercikus' presentation certainly prejudiced them.

Responding to the Kercikus' due process challenge, the INS contends that the judge properly terminated the hearing once he determined that Kerciku was not credible. The INS asserts that credibility is "a threshold issue that must be decided in the applicant's favor before it can be determined whether his testimony met the probative standards for asylum eligibility," *see* 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). In other words, the INS argues that the Kercikus did not have a right to continue their hearing or present further testimony because the judge had already made a credibility determination that doomed their application.

We reject this argument. An applicant's right to present testimony to support his or her claims is not nullified by adverse considerations, including negative credibility findings, that may weigh against, or even ultimately

doom, the applicant's case in the judge's eyes. The INS made a similar argument in *Podio*, contending that it was not necessary to allow the applicant to present additional testimony because other material in the record, including his less than "straightforward" answers to questioning at the hearing, had already undermined his application, 153 F.3d at 509. We rejected the INS's argument because it disregarded the importance of due process in immigration proceedings:

> We are troubled by the implication of this argument, for it asks us to disregard Podio's contention that, at his hearing, he was not permitted to present the evidence that he was *entitled* to present (footnote omitted). We will not marginalize or bracket the requirements of due process in assessing the reasonableness of the immigration judge's decision. The issue we address here is not whether the evidence as it stands supports the result reached by the immigration judge and the BIA. Rather, the issue is whether the original deportation hearing was conducted in a fair enough fashion for one to determine that the BIA's decision was based on reasonable, substantial, and probative evidence.

*Id.* Whether the applicant will ultimately succeed on his or her application is not the point—the critical issue is whether the applicant received a "fair" hearing. The Kercikus did not, and therefore, the case must be remanded.

## Conclusion

After making up his mind about the Kercikus' case, the immigration judge terminated their removal hearing without allowing them to present their most favorable testimony. In so doing, the judge deprived the Kercikus of "a meaningful opportunity to be heard" and violated

their due process rights. Therefore, we grant the Kercikus' petition for review, vacate the deportation order, and remand for further proceedings in accordance with this opinion. Although the choice of a presiding judge is left to the discretion of the BIA, we strongly urge the BIA to assign a different judge to the Kercikus' case on remand (*cf.* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit).

A true Copy:

      Teste:

             _____
              *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*