In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3868 & 04-3138

MARIBEL RODRIGUEZ GALICIA,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,[1]
United States Attorney General,

*Respondent*.

———————

Petitions for Review of Orders of
the Board of Immigration Appeals.
No. A76-543-342

———————

ARGUED MAY 12, 2005—DECIDED SEPTEMBER 2, 2005

———————

Before RIPPLE, ROVNER and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The Immigration and Naturalization Service ("INS") brought removal proceedings against Maribel Rodriguez Galicia. Ms. Rodriguez applied for asylum and withholding of removal and an Immigration

———————

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted the current Attorney General of the United States, Alberto R. Gonzales, for his predecessor as the named respondent.

Judge ("IJ") denied her application and the Board of
Immigration Appeals ("BIA" or "Board") affirmed. She
timely petitioned for review to this court and filed a motion
to reopen with the BIA. The BIA denied her motion to
reopen and she separately petitioned for review of this
denial. For the reasons set forth in the following opinion, we
grant her first petition, vacate the decision of the IJ and
remand for further proceedings.

# I

## BACKGROUND

### A. Facts

Ms. Rodriguez was born in a rural Guatemalan town
and later moved to Guatemala City, where she met and
married her husband, university student Armando Flores.
At the time, the nation was engulfed in a long-running
civil war and, according to Ms. Rodriguez, Mr. Flores
became sympathetic with one guerrilla group, the Unidad
Revolucionaria Nacional Guatemalteca ("URNG"). She
claims that Mr. Flores actively supported URNG in sev-
eral ways: he used a car registered in her name to bring
supplies to URNG guerrillas; he attended URNG meet-
ings and distributed pamphlets for the group; and he
participated in Huelga de Delores, an annual anti-govern-
ment demonstration.

On January 21, 1995, Mr. Flores went to register for his
university classes with a friend. The two never returned,
and Ms. Rodriguez, who was pregnant with the couple's
second child, contacted the police. The police had no
information about Mr. Flores and told her that she could not

file a missing person report until twenty-four hours passed. She and her father-in-law found Mr. Flores' body in a town morgue outside of Guatemala City; according to Ms. Rodriguez, his body had been found with that of his friend in an empty lot near a military base. Both men evidently had been tortured and then shot. A car allegedly registered in Ms. Rodriguez' name was found near the bodies, but she claimed that her registration papers were missing.

A neighbor told Ms. Rodriguez that Guatemalan security agents had come to her home while Ms. Rodriquez was looking for her husband. The neighbor knew that the men were associated with the government because their vehicle bore official license plates, which characteristically began with a "0" and consisted of just two or three numbers. According to Ms. Rodriguez, Guatemalans at the time paid close attention to license plates because they feared government agents. Moreover, she claimed that government agents often would intimidate the families of murdered dissidents; this tactic, she believed, motivated the visit to her home and the later appearance of two unknown men driving an official vehicle at her husband's funeral.

Four days after Mr. Flores' murder, Ms. Rodriguez registered at a clinic under an assumed name and gave birth to their son. Three individuals, again driving an official vehicle, came to the clinic looking for "Maribel de Flores" but were turned away by a nurse. According to Ms. Rodriguez, a doctor advised her to leave the clinic for her own safety. Ms. Rodriguez, together with the newborn and a four-year-old child, moved in with her husband's parents, who lived in Guatemala City. Her living arrangements ran contrary to Guatemalan custom— generally a widow will return to the home of her own parents—but Ms. Rodriguez claimed that it was impractical to return to her home town and believed that the govern-

ment would be less likely to find her if she was living with her in-laws. Nevertheless, she asserts that government agents found her and that she began to receive threatening telephone calls and death threats. She claims that the threats caused anxiety attacks that twice required hospitalization. Eventually, she left the home of her in-laws and moved in with an uncle who lived four hours away.

The uncle sought visas from the United States for Ms. Rodriguez and her children and helped her complete the application process. Soon after, in February 1996, he was kidnapped—by agents driving official vehicles—and murdered after apparently being tortured. She believes that the government murdered him for sheltering her. Ms. Rodriguez and the children left for the United States, entering with valid tourist visas on February 26, 1996. She returned to Guatemala in September 1997 to attend her father's funeral, traveling under an alias and a false passport. She was detained on October 12, 1997 when she attempted to reenter the United States. She told immigration officials that she feared harm if she was returned to Guatemala but falsely claimed that her children lived in Guatemala and that she obtained her passport there. At her credible fear interview nine days later, Ms. Rodriguez claimed to fear returning to Guatemala because her husband had been murdered by the government, though she did not mention his URNG ties and stated that he was not a member of a political party. The interviewer found that she demonstrated a credible fear of persecution upon return and her case was set for hearing before an IJ in Chicago, Illinois.

## B. Agency Proceedings

### 1.

Ms. Rodriguez applied for asylum and alternatively for withholding of removal. She appeared for a hearing on her asylum request on September 28, 1998, which began more than an hour after it was scheduled.[2] Ms. Rodriguez testified to the facts described above. She claimed that she lied to immigration officials in her first interview "[b]ecause at that time, I was very anguished because I thought that the policeman was just filling out a form so that he could return me to Guatemala, because I did not want them to return me . . . under my true name, because I feared that when I returned there I would be persecuted." A.R.1410.[3] She further stated that she did not understand the United States' asylum process; the concept of asylum is foreign to Guatemala. She attributed her denial of her husband's political activities to confusion about whether the URNG was a political party—confusion that remained after the IJ questioned her on the point.

Ms. Rodriguez sought to introduce the testimony of two experts in human rights and Latin America, Professors Daniel Rothenberg and Douglas Cassel; in addition, prior to the hearing Ms. Rodriguez entered an affidavit from Professor Rothenberg, but not from Professor Cassel, into

---

[2] The record contains no suggestion that the delay in starting was in any way attributable to Ms. Rodriguez.

[3] For reasons that shall become clear, there are two copies of the administrative record before this court. For ease of reference, we refer only to the record in No. 04-3138, filed on October 28, 2004.

evidence. Professor Rothenberg was unavailable to testify in person at the hearing, and Ms. Rodriguez had moved to present his testimony by telephone. The IJ denied her motion at the start of the hearing, stating simply, "No, I'm not going to hear any telephonic testimony, all right? We're going to start with the respondent now." A.R.1343. The IJ held Ms. Rodriguez to a strict time limit in presenting her evidence. As her direct examination neared its conclusion, the IJ asked her counsel:

> Q: Anything further of this witness, counsel? You do have a time limit, unfortunately, and if you wish the Government to cross-examine, and you have a witness to present, I would suggest that you wrap it up.
>
> A: Certainly, if I may just ask a few more questions.
>
> Q: You may take as much time as you wish, but there's going to be a time that I'm going to pass the witness. If I have no time for your expert, that will be it. All right. I will not reset the case today. All right. So, you have a certain amount of time that you can present your case.

A.R.1395-96.

Ms. Rodriguez testified for approximately one hour. True to his prediction, the IJ commented that "time has evaporated" and refused to allow Professor Cassel's testimony, instead instructing Ms. Rodriguez to "make an offer of proof as to [her] expert witness if he were to testify . . . to preserve it for the record." A.R.1423. Ms. Rodriguez made an offer of proof for both Professors Rothenberg and Cassel. According to Ms. Rodriguez, Professor Rothenberg would testify that Mr. Flores' killing was consistent with and could only be the work of Guatemalan security forces, whose tactics often included the continuing intimidation of a

murdered dissident's widow. Professor Cassel's proposed testimony mirrored Professor Rothenberg's and also indicated that university students like Mr. Flores were under particular scrutiny by the security forces. Both experts would testify that the practices that Ms. Rodriguez claimed to fear continued despite recent changes in the Guatemalan government.

The IJ denied Ms. Rodriguez' petition for asylum and withholding of removal after first determining that Ms. Rodriguez was not a credible witness because she failed adequately to explain discrepancies in her accounts. For instance, the IJ determined that Mr. Flores was not an active URNG sympathizer; Ms. Rodriguez had denied his political activities during the credible fear interview and the IJ found that her testimony about his activities at the hearing was an attempt to "'embellish' her story." A.R.1307. The IJ similarly found it suspicious that, in the same interview, Ms. Rodriguez had denied her husband's participation in Huelga de Dolores, and noted that she "lack[ed] familiarity with the URNG, including the fact that she referred to it as the UR<u>M</u>G during the hearing." A.R.1308. Moreover, the IJ found it "deeply troubling" that Ms. Rodriguez was unable to corroborate the "linchpin of her asylum claim," "the alleged fact that the car [found with Mr. Flores' body] was registered in her name." *Id.* The IJ summarized his credibility findings:

> [T]he court finds that the respondent's testimony is not credible with respect to her husband's purported involvement in the URNG. It does not appear that the respondent's husband was involved in any manner with the guerrillas. Furthermore, the court finds that there is no credible evidence which suggests that a car registered in the respondent's name was used to

transport supplies to the URNG. The respondent's husband was not killed on account of his political opinion, and the respondent had not faced persecution because his political opinions were imputed to her. As the respondent's testimony on whether the alleged persecution occurred . . . has been found to be incredible, she has failed to establish her eligibility for asylum, and the application will accordingly be denied.

A.R.1308-09.

The IJ then considered the merits of Ms. Rodriguez' petition and first evaluated whether she had proven eligibility for asylum based on past persecution. The IJ found no evidence that Ms. Rodriguez' husband and uncle were killed "in order to punish" her, *id.*, and found it more likely that they were victims of crime. Moreover, the IJ found no evidence that Ms. Rodriguez was mistreated by government agents; indeed, the IJ doubted the identification of mysterious visitors as government agents, noting that "[i]t seems remarkable that these people payed [sic] such close attention to the license plate numbers." A.R.1310. The IJ again found it more likely that the visitors at Mr. Rodriguez' funeral and at the hospital were friends of his or policemen investigating his death, but at any rate found it significant that they took no "hostile action" against her. *Id.* The IJ similarly discounted Ms. Rodriguez' accounts of the threatening phone calls she received. Thus, the IJ found that Ms. Rodriguez presented insufficient evidence of past persecution.

The IJ then rejected Ms. Rodriguez' claim to fear future persecution. In support of this decision, the IJ noted seven "actions taken by the respondent suggest[ing] that her fear of persecution is not genuine," A.R.1311: (1) she

gave her son the surname of his father, Flores, despite testifying that she was afraid to use it herself; (2) she moved in with her in-laws, in spite of Guatemalan custom and in spite of the fact that this arrangement placed her closer to government agents; (3) she investigated her husband's death independently; (4) she waited until four months after the last threatening phone call to move from her in-laws' house; (5) she never attempted to apply for asylum after first entering the United States; (6) despite her alleged fear, she returned to Guatemala for her father's funeral; and (7) she only applied for asylum after being detained by the INS. Moreover, the IJ found that any subjective fear was objectively unreasonable because, according to reports from the United States Department of State, the URNG no longer was a guerrilla group. Indeed, the IJ noted that, despite an upsurge in criminal activity, the human rights situation in Guatemala had improved dramatically.

Because Ms. Rodriguez did not establish eligibility for asylum, the IJ found that she failed to prove the more stringent requirements to demonstrate eligibility for withholding of removal. The IJ thus denied her applications and ordered her removal to Guatemala.[4]

### 2.

Ms. Rodriguez appealed to the BIA, arguing, among other things, that the IJ conducted the hearing in a manner that violated her right to due process. The BIA affirmed the IJ,

---

[4]  As her applications were on appeal to the BIA, Ms. Rodriguez gave birth to her third child, a daughter, who is a citizen of the United States.

although it cited *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994) for the proposition that its affirmance did not "imply agreement with all aspects of the decision." A.R.438. The BIA did not make a complete statement of reasons for affirming, but purported to offer only "explanatory comments" about her due process claim. *Id.* In particular, the BIA noted that IJs are granted broad discretion to conduct immigration hearings. It commented that Ms. Rodriguez failed to object to presenting an offer of proof instead of live testimony from her witnesses, and at any rate Professor Rothenberg's report was included in the record. The BIA thus found that Ms. Rodriguez received a full and fair hearing. Ms. Rodriguez timely appealed the BIA's decision to this court on October 29, 2003.

### 3.

Before we took her appeal under advisement, Ms. Rodriguez filed a motion to reopen her case with the BIA. She argued that two changed circumstances warranted reopening her case. First, she had been diagnosed with a serious kidney disorder, crescentic membranous glomerulonephritis, which is likely to be fatal. The condition required an organ transplant and dialysis and, she submitted, removing her to Guatemala would "be tantamount to a death sentence." A.R.285. Second, Ms. Rodriguez noted that she had given birth to a United States-citizen daughter, Dianna. Ms. Rodriguez asserted that her removal and consequent death would result in hardship to her children and would, in effect, exile Dianna to Guatemala—where the infant's citizenship would place her in peril. Ms. Rodriguez also requested that her removal be canceled pursuant to 8 U.S.C. § 1229b(b).

The BIA denied her motion to reopen. It held that she failed to meet the heavy burden governing such motions and failed to demonstrate how her illness would subject her to persecution in Guatemala. The BIA rejected her claim of hardship on her children as "not germane to her persecution claim." A.R.3. The BIA also found that she did not qualify for cancellation of removal because she had not been present in the United States for the requisite ten-year period. 8 U.S.C. § 1229b(b)(1)(A).

Ms. Rodriguez separately sought review of the BIA's denial of her motion to reopen. Because she timely appealed both the BIA's original decision on the merits and the denial of her motion to reopen, we consolidated this action with her previous appeal.

## II

## DISCUSSION

### A. Standard of Review

Where, as here, the BIA adopts the rationale of the IJ, we review the IJ's decision. *Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002). Ms. Rodriguez bore the burden of proving her eligibility for asylum. *Oforji v. Ashcroft*, 354 F.3d 609, 612 (7th Cir. 2003). We review the IJ's determination that she failed to meet her burden under a highly deferential standard, and will affirm if its decision is supported by "'reasonable, substantial, and probative evidence on the record as a whole.'" *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002). "We give great deference to an IJ's credibility determinations so long as they are

supported by cogent reasons that bear a legitimate nexus to the findings." *Hysi v. Gonzales*, 411 F.3d 847, 852 (7th Cir. 2005).[5] We will reverse the BIA's determinations about the availability of corroborating evidence only if we find that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.[6] Despite these

---

[5] Congress recently altered the standards by which IJs reach credibility determinations in asylum and withholding cases through the REAL ID Act. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Division B—REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), (b), 119 Stat. 231 (codified at 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C)). These changes "take effect on the date of the enactment of this division [May 11, 2005] and . . . apply to applications for asylum, withholding, or other relief from removal made on or after such date." REAL ID Act § 101(h)(2). The portions of the REAL ID Act affecting credibility determinations thus do not apply to determinations made in the course of Ms. Rodriguez' 1998 petition. *See, e.g.*, *Dhima v. Gonzales*, ___ F.3d ___, 2005 WL 1774549, at *5 n.3 (1st Cir. 2005).

[6] The REAL ID Act also modified the standards by which this court reviews an IJ's determination concerning the availability of corroborating evidence. REAL ID Act § 101(e) (codified at 8 U.S.C. § 1252(b)(4)). Specifically, the Act provides that "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." *Id.* Unlike REAL ID Act provisions concerning credibility determinations, section 101(e) applies "to all cases in which the final administrative removal order is or was issued before, on, or after [May 11, 2005]," and thus applies to Ms. Rodriguez' claim. *Id.* § 101(h)(3);

(continued...)

deferen-tial standards, the question of whether an asylum hearing comported with the requirements of due process is purely a legal one which we review de novo. *Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003).

Motions to reopen, like motions for a new trial, are strongly disfavored, and we review deferentially the BIA's decision to deny Ms. Rodriguez' motion. *Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004) (citing *INS v. Doherty*, 502 U.S. 314 (1992)).

## B.  Application for Asylum and Withholding

Ms. Rodriguez claims that the IJ conducted her asylum hearing in a manner that violated her right to due process. The IJ's decision to deny her application was based largely on findings that she was not a credible witness and that she failed to provide corroboration for her account. We therefore first consider the IJ's findings before turning

---

[6]  (...continued)
*see Fessehaye v. Ashcroft*, 414 F.3d 746, 752-53 (7th Cir. 2005).

The IJ's determination that Ms. Rodriguez failed to corroborate the "linchpin of her claim," by not providing evidence that the vehicle found near Mr. Flores was registered in her name, significantly contributed to the IJ's ultimate denial of her petition. A.R.1308. Evidently, the IJ believed that corroborating evidence was available but not presented. *Id.* ("She apparently made no attempt to obtain proof from Guatemala that the automobile had been registered under her name. Similarly, although she asserted that she had a driver's license in Guatemala, she was unable to corroborate that claim either."). We review this determination under the standard established by the REAL ID Act.

to the merits of Ms. Rodriguez' due process claim.

### 1. Credibility Determination

Ms. Rodriguez submits that the IJ's adverse credibility determination was unsupported and that the IJ improperly and unreasonably required her to corroborate her claim that the car found near her husband's body was registered in her name. Indeed, she points out that her expert witnesses, who were barred from testifying by the IJ, could corroborate much of her account of events in Guatemala. The Government responds that the IJ was in a position to evaluate Ms. Rodriguez' credibility, and that the deference that this court owes to the IJ counsels against disturbing the IJ's credibility findings.

The IJ's "[c]redibility determinations are accorded substantial deference, but they must be supported by specific, cogent reasons" and "must bear a legitimate nexus to the finding." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999) (internal quotation marks and citations omitted). In other words, the IJ's "adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They 'cannot be based on an irrelevant inconsistency.'" *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). "[W]e will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003).

In Ms. Rodriguez' case, the IJ largely based its credibility determination on inconsistencies between her credible fear interview and her testimony at the hearing. The IJ recognized that most of the inconsistencies—that she gave

a false name to immigration officials, lied about the location of her children and about how she obtained a false passport—were irrelevant and did not go to the heart of her claim.[7] Nor is there any basis for the IJ's further comment that her false statements were a "demonstration that the respondent is willing to lie in order to avoid the consequences of her actions," *id.*; Ms. Rodriguez testified that she feared the information would be provided to Guatemalan authorities and, importantly, the IJ did not find this testimony incredible. Indeed, testimony that an applicant gave false information to immigration authorities for fear of deportation to a persecuting country can be entirely *consistent* with a fear of persecution. *See Turcios v. INS*, 821 F.2d 1396, 1400-01 (9th Cir. 1987); *see also Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004); *Balasubramanrim v. INS*, 143 F.3d 157, 164 (3d Cir. 1998); *In re O-D-*, 21 I. & N. Dec. 1079, 1082 (BIA 1998). Another inconsistency relied upon by the IJ—Ms. Rodriguez' perceived lack of familiarity with the URNG—also was irrelevant to the question at hand: whether *Mr. Flores* was involved with the URNG and whether his political opinion was imputed to Ms. Rodriguez.

The sole remaining basis for the IJ's credibility determination, then, was described as the "linchpin" of Ms. Rodriguez' claim: her failure to corroborate the fact that the car found next to Mr. Flores' body was registered in her name. The IJ's reliance on a lack of corroboration also fails because the car registration was irrelevant to the issues Ms. Rodri-

---

[7] The IJ commented that "[t]hese statements, *though they do not undercut the central elements of her asylum claim in themselves*[,] are a further demonstration that the respondent is willing to lie." A.R.1308 (emphasis added).

guez presented. Ms. Rodriguez never claimed that Guatemalan security forces intimidated her because she was the car's registered owner; rather, she claimed that they intimidated her because she was the wife of a murdered dissident. The vehicle registration would have provided little by way of corroboration. Of much greater import was the proposed testimony of her expert witnesses, whom she claimed would have testified that the Guatemalan agents were suspicious of and scrutinized the activities of university students like Mr. Flores. Moreover, the experts might have corroborated her account by demonstrating that the alleged activities of the unknown individuals were consistent with the manner in which the government intimidated spouses of slain opposition figures.[8]

The IJ relied upon irrelevant inconsistencies in reaching an adverse credibility finding. The IJ's credibility determination thus was unsupported by substantial evidence. Indeed, the irrelevant vehicle registration became the "linchpin" of Ms. Rodriguez' case only because the IJ prevented her experts from testifying. We turn now to consider this exclusion in evaluating Ms. Rodriguez' due process claim.

---

[8] Even assuming that the car registration was critical to Ms. Rodriguez' claim, any assertion that she was targeted because of the registration relied upon its *absence* from her car, and the resulting inference that it was absent because government agents took it when they murdered Mr. Flores. In this circumstance, "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence [wa]s unavailable," and the IJ erred in relying on the lack of corroboration. 8 U.S.C. § 1252(b)(4).

### 2.  Due Process

Ms. Rodriguez asserts that the IJ conducted the asylum hearing in a manner that violated her right to due process by barring the testimony of Professors Rothenberg and Cassel. Their testimony was critical to her claim, according to Ms. Rodriguez, because their expertise would provide both corroboration and context for the events that she described. She further argues that the IJ, in the interest of time, truncated her testimony and thus prevented her from fully presenting her case. Moreover, Ms. Rodriguez contends that the IJ ignored the expert evidence that was presented—Professor Rothenberg's affidavit—in reaching a decision to deny her application.

The Government responds that the IJ conducted the hearing, and required corroboration, within the bounds of its discretion and the process due. It points out that the IJ afforded Ms. Rodriguez an opportunity to give an offer of proof and, at any rate, had before it Professor Rothenberg's affidavit. As for Professor Cassel, the Government argues that his proposed testimony was cumulative and that, if Ms. Rodriguez "believed that further information from Mr. Cassel might have helped her case, the solution was to obtain an affidavit from him." Respondent's Br. at 35. Indeed, the Government asserts, the experts could not have assisted Ms. Rodriguez because they had no knowledge about *her* alleged persecution.

"[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Due process requires that the applicant be afforded "a meaningful opportunity to be heard," *Nazarova v. INS*, 171 F.3d 478, 482 (7th Cir. 1999), and a "reasonable opportunity to . . . present evidence on the

alien's behalf," 8 U.S.C. § 1229a(b)(4)(B). "Although
what constitutes 'a meaningful opportunity to be heard'
is far from clear, we distinguish between two types of
situations when analyzing due process challenges." *Kerciku*,
314 F.3d at 917. In the first situation, the IJ limits some
testimony or frequently interrupts that of the applicant. The
IJ does not violate due process by focusing the hearing in
this manner to focus the proceedings and exclude relevant
evidence. *Id.* "In the second type of situation, by contrast,
the immigration judge violates due process by barring
complete chunks of oral testimony that would support the
applicant's claims." *Id.* at 918. This categorization, while
helpful, is imprecise and the appropriate characterization of
the IJ's action is, in essence, a matter of degree. In the end,
we must determine whether, given the totality of circum-
stances, the petitioner had a full and fair opportunity to put
on her case.

Here, we must conclude that the actions of the IJ, when
evaluated in their totality, deprived Ms. Rodriguez of her
right to due process.

We have reversed IJ determinations when the IJ "took
over the questioning, so that in the end the judge, rather
than the attorney, had elicited whatever testimony" the
applicant offered. *Podio v. INS*, 153 F.3d 506, 510 (7th Cir.
1998); *see also Kerciku*, 314 F.3d at 918. Our review of the
hearing transcript reveals that, in Ms. Rodriguez' case, the IJ
frequently interrupted her testimony and often allowed her
counsel to ask no more than a few questions in series.
Indeed, at times, the record may be read plausibly as
indicating a certain hostility to Ms. Rodriguez. In any event,
the frequency and length of the IJ's interruptions raise
significant concern as to whether this questioning was
merely attempting to point Ms. Rodriguez in what the IJ

thought was "the right direction" or to "focus the hearings on relevant matters." *Podio*, 153 F.3d at 510 (internal quotation marks omitted). Indeed, at times, the IJ's questioning clearly assumes the role of counsel for the Government. It goes beyond clarification or simply filling in the interstices of Ms. Rodriguez' testimony and becomes de facto cross-examination of the witness.

If the IJ's overly active role in the presentation of Ms. Rodriguez' testimony was our only concern, it would be a fairly close question as to whether there had been a denial of due process. There are, however, other concerns. More troubling than the IJ's questioning was the strict time limit that the IJ imposed on Ms. Rodriguez, which in turn prevented her from presenting the readily available testimony of Professors Rothenberg and Cassel—the former by telephone, the latter in person. Contrary to the Government's apparent assertion, we have never required that an expert witness testify to the facts of the particular applicant's claim. Rather, Ms. Rodriguez tendered the experts to demonstrate that portions of her account were consistent with the practices of the Guatemalan government, and thus to corroborate her testimony. Nothing in the curricula vitae of Professors Rothenberg or Cassel demonstrated that they were unqualified to offer expert evidence, and their testimony undoubtedly would have been helpful to the IJ in determining whether Ms. Rodriguez suffered past persecution. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) (noting that the "spirit" of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applies to immigration proceedings).

For example, Professor Rothenberg's testimony was intended to demonstrate that the manners in which Ms. Rodriguez' husband and uncle were killed were consis-

tent with the practices of Guatemalan security forces. It is possible that this testimony would have alleviated the IJ's concern that the men were victims of crime rather than of government persecution. Moreover, Ms. Rodriguez asserted that his testimony would demonstrate that the visits by mysterious agents were consistent with the state's practice of intimidating victims' spouses. Such testimony may have demonstrated that Mr. Flores' political opinions had been imputed to his wife. In addition, according to Ms. Rodriguez' offer of proof, Professor Cassel could demonstrate that the threat to Ms. Rodriguez in Guatemala survived the recent change of government; this testimony, potentially, directly addresses the IJ's determination that Ms. Rodriguez faced no further threat.[9] Indeed, with the benefit of the experts' testimony, the IJ may have been able to confirm or discount suspicions that led to the denial of her application; for instance, perhaps the experts could indicate whether it is "remarkable that [Guatemalans] payed [sic] such close attention to the license plate numbers." A.R.1310. The opportunity for the IJ to ask questions and for the experts to answer—an opportunity that the IJ liberally exercised with Ms. Rodriguez—could only have been accomplished with live testimony. Moreover, despite their potential value to adjudicating Ms. Rodriguez' application, the IJ's only explanation for not hearing Professor Cassel was the self-imposed time constraint; the IJ offered no explanation for excluding Professor Rothenberg's telephonic testimony.

---

[9] In her offer of proof, Ms. Rodriguez indicated that Professor Cassel could testify as to the current threat Ms. Rodriguez faced in Guatemala. In this respect, Professor Cassel's proposed testimony differed from that of Professor Rothenberg. Thus, contrary to the Government's assertion, Professor Cassel's testimony was nonduplicative.

In short, an evaluation of the record as a whole establishes that Ms. Rodriguez was denied her right to have "a meaningful opportunity to be heard." *See Kerciku*, 314 F.3d at 918. However, to establish a due process violation, we also require a petitioner to demonstrate that she was prejudiced by the IJ's actions. *See id.* We find such prejudice in this case. The proposed expert testimony went to the heart of Ms. Rodriguez' claims of past persecution and fear of future persecution. In addition, if the testimony presented by Professors Rothenberg and Cassel had corroborated Ms. Rodriguez' account, the IJ might have reached a different conclusion as to her credibility. The testimony that Ms. Rodriguez sought to introduce "had the potential for affecting the outcome of" the proceedings, and she has established a due process violation. *Podio*, 153 F.3d at 511 (internal quotation marks omitted). The IJ thus reached a decision based upon an erroneous credibility determination and without the evidence necessary to evaluate Ms. Rodriguez' application. In such circumstances, we generally require "a new hearing in compliance with due process," and we therefore remand to give Ms. Rodriguez an opportunity to fully and fairly present her case. *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993).[10]

---

[10] Because we remand for a hearing that comports with due process, we need not address Ms. Rodriguez' motion to reopen or the merits of her asylum claim. On rehearing, Ms. Rodriguez and the Government will have the opportunity to submit argument and evidence concerning the claims of poor health and hardship contained in her motion to reopen. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1045 (7th Cir. 2003).

## Conclusion

For the foregoing reasons, we grant the petition for review, vacate the IJ's decision and remand to the BIA for further proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED;
REVERSED and REMANDED

A true Copy:

   Teste:

                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*