# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 05-1754

NATAŠA DJEDOVI, , *et al.*,

*Petitioners,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals

---

ARGUED MARCH 1, 2006—DECIDED MARCH 23, 2006

---

Before EASTERBROOK, WILLIAMS, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Sabrije Slakovi*f* and Nataša Djedovi*f* are citizens of Serbia and Montenegro (ЕD$4 " 4 OD>" ' @D"), one of the shards into which Yugoslavia fractured following the collapse of communism in eastern Europe. They seek asylum in the United States on behalf of themselves and their three dependent children. Slakovi*f* was drafted, went into hiding to avoid military service, was caught, and deserted after nine days; he contends that if returned he would be persecuted because of this desertion and his opposition to the use of force against fellow Muslims. Djedovi*f*, a Christian, contends that she would be persecuted because of her marriage to Slakovi*f*;

many residents of Pe.urice, where they lived together in Montenegro, adamantly oppose marriage across religious lines. Slakovi*f* and Djedovi*f* sought other forms of relief, but because they proposed to enter the United States under a visa-waiver program only a grant of asylum would entitle them to remain. See *Wigglesworth v. INS*, 319 F.3d 951, 955-56 (7th Cir. 2003).

Slakovi*f* was drafted in May 1999, during the Kosovo War. Serbian forces were removing ethnic Albanians from Kosovo. The European Union and the United States opposed this, and in March 1999 NATO began military activities against Serbia. Hostilities lasted until June 10, 1999, when Slobodan Miloševi*f* gave up the fight and United Nations peacekeepers separated the Serbian and Albanian combatants. The conflict had ethnic rather than religious roots, but about 70% of ethnic Albanians are Moslem, and Slakovi*f* did not want to take up arms against his co-religionists. He contends, moreover, that during his brief period of training he heard some other soldiers relish the prospect of killing Moslems. He does not maintain, however, that the military deprived him of weapons or planned to use him (or other Moslems) as cannon fodder, as Serbian forces sometimes had done in the Bosnian conflict. The immigration judge acknowledged that exposing adherents of one religion to greater risks of injury in combat than members of another would be a form of persecution. See, e.g., *Miljkovic v. INS*, 376 F.3d 754 (7th Cir. 2004); *Begzatowski v. INS*, 278 F.3d 665 (7th Cir. 2002). Being trained to engage in atrocities also could be persecution, see *Matter of A- G-*, 19 I&N Dec. 502, 506 (BIA 1987), but Slakovi*f* does not contend that this was his unit's objective.

The immigration judge, who believed Slakovi*f*'s testimony, concluded that the events he described do not amount to persecution; the Board of Immigration Appeals agreed. Substantial evidence supports that decision. All Slakovi*f* faced was military conscription, which is not

a form of persecution, see *Tesafu v. Ashcroft*, 322 F.3d 477, 482 (7th Cir. 2003); *Mojsilovic v. INS*, 156 F.3d 743, 747 (7th Cir. 1998), and comments by other soldiers not directed against him personally. See *Mitev v. INS*, 67 F.3d 1325, 1330-31 (7th Cir. 1995). Even if we assume that Slakovi*f* would be imprisoned on return for his desertion, that is not persecution unless the draft and military service are persecution. Slakovi*f* does not contend that Moslem deserters are treated worse than Christian deserters. Indeed, Slakovi*f* is unlikely to be punished at all. Ex-president Miloševi*f*, who had been put on trial in an international criminal court, died earlier this month; in 2001 his successors announced an amnesty that appears to cover Slakovi*f*. Cf. *Mojsilovic*, 156 F.3d at 747.

Djedovi*f* testified that she and her children had been disowned by her parents and shunned by their neighbors in Pe.urice. People she met in the street sometimes called her "ugly words" and spat in her direction. Again the immigration judge believed this testimony; again he found that this does not amount to persecution. Shunning is private activity rather than anything sponsored, approved, or enforced by the state. Djedovi*f* does not contend that she or her children were in physical danger; the family lived in Pe.urice for six years without incident beyond the personal unpleasantness, and Slakovi*f* was gainfully employed. (Djedovi*f*, who remained home to care for the children, did not testify that she was in the job market and had been unable to find work.) The agency's decision that these events do not justify asylum is supported by substantial evidence and does not rest on any legal error.

Slakovi*f* and Djedovi*f* maintain, however, that the record is incomplete, and they contend that the immigration judge violated the Constitution by refusing to accept telephonic testimony by Bernd Fischer, professor of Balkan history at Indiana University. Reliance on the due process clause is not only unnecessary but also inappropriate, as we pointed

out in *Rehman v. Gonzales*, No. 05-2846 (7th Cir. Mar. 20, 2006). Statutory arguments take precedence over constitutional ones, and because every alien must have "a reasonable opportunity . . . to present evidence on the alien's own behalf," 8 U.S.C. §1229a(b)(4)(B), the only question we need consider is whether that "reasonable opportunity" was afforded. It is difficult to imagine how an immigration judge could provide the "reasonable opportunity . . . to present evidence" required by statute, yet still violate the due process clause.

Two business days before the hearing, counsel filed a motion asking the immigration judge to take Fischer's evidence by telephone. The judge denied this motion on the date set for the hearing, informing the parties that he preferred either live testimony or written reports from expert witnesses. The judge also declined to postpone the hearing, a step that would have inconvenienced other participants and disrupted the immigration court's schedule (and thus affected the hearing dates for other aliens). He invited counsel to furnish Professor Fischer's evidence in writing after the oral testimony had been concluded. Counsel did not accept this invitation. Instead of filing an expert's report while the record remained open, he furnished only a three-page statement from Fischer summarizing his qualifications and listing topics he would have addressed, such as "[t]he development of modern extreme nationalism in Serbia-Montenegro through the Milosevic years. The impact of nationalist acculturation on Moslems[.]"

Counsel asserts that he was surprised when the immigration judge denied his motion; other judges (and this judge on other occasions) had accepted evidence by phone, so why not this judge this time? There is, however, an easy way to avoid surprise: advance notice. Regulations entitle each immigration court to establish procedures covering subjects not addressed by national rules. 8 C.F.R. §1003.40. The

Immigration Court's branch in Chicago, where this hearing occurred, requires motions to precede the hearing by at least 14 days. See http://www.usdoj.gov/eoir/efoia/ocij/ localop/chilop.pdf. Notice gives the judge a chance to rule in advance, so that everyone can be prepared when the hearing begins (or the court can rearrange its own schedule to make productive use of time should the hearing be rescheduled). The immigration court gave the aliens eight months' notice of the hearing date; the least they could have done in return was give two weeks' notice of motions *in limine*. Counsel for Djedoviƒ and Slakoviƒ does not offer any reason for ignoring this rule and therefore is in no position to complain that, when an adverse decision was made on the spot, he was unprepared.

This situation is not remotely like that in *Niam v. Ashcroft*, 354 F.3d 652 (7th Cir. 2004). The immigration judge in *Niam* had promised to accept evidence by phone, then changed his mind during the hearing after learning that the expert witness was outside the United States. That not only surprised the alien's lawyer, who had relied on the order allowing telephonic evidence, but also was arbitrary: the immigration judge did not explain what difference it could have made that the other end of the line was in Prague rather than Hanover, New Hampshire. 354 F.3d at 659. (Nor is our situation governed by *Rodriguez Galicia v. Gonzales*, 422 F.3d 529 (7th Cir. 2005), which held that a combination of errors including refusal to accept telephonic evidence made a hearing inadequate to permit reliable decision.)

Apart from issues of notice and surprise, there is nothing arbitrary about favoring live over remote testimony (as every federal court does) or favoring written reports from experts over phone connections. The norm in federal civil litigation is an expert's written report *plus* live testimony in court, so that counsel can explore logical or empirical shortcomings in the expert's analysis. Expert testimony neither preceded nor followed by a written report

may end up being little more than *ipse dixit*, which is unhelpful to the tribunal. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). See also, e.g., *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005).

As between oral testimony alone and a written report alone, the latter may be more helpful, because it facilitates review of the conclusions' logical and empirical force. The effect of an expert's evidence depends on the quality of its reasoning and the scope of its data, not on the expert's bearing. Good scholarly analysis does not become bad because a professor stutters or fidgets. That's why "observable factors like demeanor and tone of voice are less important when it comes to expert witnesses, whose reliability is supposed to be based on their expertise rather than on what they claim to have witnessed." *Hamid v. Gonzales*, 417 F.3d 642, 646 (7th Cir. 2005). Judges often overestimate their ability to sift true from false testimony by assessing demeanor, which is a form of lie detector without the electrodes and graph paper. The comprehensiveness and logical consistency of testimony is far more valuable and can be evaluated on paper as well as, if not better than, through oral presentations.

That is why the Supreme Court held in *Richardson v. Perales*, 402 U.S. 389 (1971), that both the Constitution and the Administrative Procedure Act permit agencies to receive expert evidence in written form, without producing the expert for oral testimony. The opportunity to present Fischer's evidence in writing would have served Djedovi*ƒ* and Slakovi*ƒ* equally well. Yet, as we have noted, they did not accept the immigration judge's invitation. The set of talking points that Fischer provided after the hearing does not qualify even as an offer of proof, for it does not reveal the *substance* of his testimony, as opposed to the topics he

would have covered. Not having made an offer of proof, Slakovi *ƒ* and Djedovi *ƒ* cannot contend that the record is insufficient; we could not tell whether the missing evidence would have been material and therefore whether the immigration judge's decision was prejudicial to the aliens. See, e.g., *Rehman*, slip op. 5-6; *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004); *Roman v. INS*, 233 F.3d 1027, 1033 (7th Cir. 2000).

Without citing *Perales*, one court of appeals has held that limiting an alien to written expert testimony violates the Constitution. See *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1056-58 (9th Cir. 2005). It is hard to accept a decision that fails to engage controlling authority from the Supreme Court. At all events the immigration judge in our case did not limit expert witnesses' presentation to paper alone, as the judges in *Lopez-Umanzor* and *Rodriguez Galicia* did; he simply insisted that the witness appear in person. Had counsel made a timely motion, it might have been possible to reschedule matters (on the expert's end or the immigration judge's) to permit his testimony to be given in person. The combination of a belated motion with failure to provide a post-hearing report has made this record skimpier than it might have been, but we have no basis on which to say that the shortfall is either material or prejudicial—and the evidentiary deficiency, if any, rests at the doorstep of the aliens' lawyer rather than the agency.

The petition for review is denied.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*