Opinion by Judge PAEZ; Dissent by Chief Judge KOZINSKI.
OPINION
PAEZ, Circuit Judge:
Olakunle Oshodi petitions for review of a decision of the Board of Immigration Appeals (“BIA”) affirming the Immigration Judge’s (“IJ”) decision finding him not credible and denying his application for withholding of removal and protection under the Convention Against Torture (“CAT”).[1] Oshodi argues, inter alia, that the IJ violated his due process rights by denying him the opportunity to testify about the events of his past persecution in Nigeria while also finding him not credible and failing to give him notice before relying on lack of corroboration in the adverse credibility decision. He also argues that the IJ’s credibility analysis violated the REAL ID Act and was not supported by substantial evidence. A three judge panel of this court rejected Oshodi’s due process arguments and, reaching the merits of the IJ’s credibility determination, concluded that it complied with the REAL ID Act and was supported by substantial evidence. We granted rehearing en banc.
We hold that the IJ violated Oshodi’s due process rights at his removal hearing by cutting off his testimony on the events of his alleged past persecution in Nigeria that are the foundation of Oshodi’s withholding of removal and CAT claims. The IJ’s refusal to admit Oshodi’s testimony is particularly troublesome since Oshodi was denied relief solely on the basis of the IJ’s adverse credibility finding. It is well established that live testimony is critical to credibility determinations. Thus, the IJ’s restrictions on Oshodi’s testimony precluded the IJ from conducting a proper “totality of the circumstances” credibility analysis. Because we conclude that Oshodi did not receive a full and fair hearing as guaranteed by the Fifth Amendment, we grant the petition and remand for a new hearing. We therefore do not reach Oshodi’s other arguments.
BACKGROUND
Olakunle Oshodi, a Nigerian national, has resided in the United States since 1981. He is married to a United States citizen, and has a United States citizen daughter.[2] He originally entered the *886 United States on a student visa in'1978. In 1981, after his visa expired, Oshodi was removed to Nigeria. He remained in Nigeria for two months and while there he claims he was detained, beaten, and tortured by the Nigerian authorities on at least two occasions on account of his political activities.
In a declaration attached to his asylum application, Oshodi stated that he was exposed to Nigerian politics, and related persecution, at an early age through his politically active mother. According to his declaration, on one occasion his mother was badly burned by molotov cocktails thrown at her by government agents. Soon after, she was killed by officers of General Gowon, the head of state from 1966 to 1975.[3] As a teenager, he joined the National Association of Nigerian Students (“NANS”), a political group initially formed to oppose General Obasanjo, leader of the military regime in power at the time and later president of Nigeria from 1999 to 2007.[4]
But it was not until his return to Nigeria in 1981 that Oshodi experienced direct persecution by the government. As Oshodi recounted in his declaration, he reentered Nigerian politics upon his return by joining the Unity Party of Nigeria, a political party affiliated with NANS. At his first rally, police officers forcefully disbanded the peaceful protest with tear gas and swagger canes. Although Oshodi escaped, many of his colleagues were detained and tortured. In the following weeks, however, Oshodi experienced two incidents of severe persecution at the hands of Nigerian officials.
On February 8, 1981, Oshodi and his colleague Doyin Odunuga were stopped at a police checkpoint. When the police officers saw their political propaganda, the police immediately ordered them out of the car, at which point Odunuga sped away. The officers shot at the car, hit Odunuga, and the car crashed. The officers pulled Oshodi and Odunuga out of the car and beat them. Odunuga was eventually sent to the hospital, where he died from his injuries eight days later. Meanwhile, Osh-odi was detained in jail and interrogated. According to Oshodi’s declaration, the officers “tortur[ed him] with different techniques,” beat him unconscious with swagger canes, and deprived him of food for two days. Ultimately, his uncle paid a bribe of $2,000 to obtain his release but Oshodi was assigned to weekly monitoring, the violation of which would trigger an “open warrant” for his arrest. Because of his continued political activity, Oshodi violated the monitoring requirement.
The following week, after driving a fellow party member to the airport, Oshodi was pulled over and detained by five officers. He was handcuffed, blindfolded, and driven to an unknown location. The officers shot him in the foot, burnt him with cigarettes, shocked him with electricity, and beat him with their pistols. They stripped him naked and doused him with gasoline, threatening to burn him alive. They sodomized him with swagger canes and dirty bottles. After they finished, the officers left him on the side of the road, where passers-by discovered him and took him to the hospital. At that point, Oshodi *887 decided he could no longer safely remain in Nigeria and fled to the United States.[5]
In light of these events in Nigeria, Osho-di sought asylum, withholding of removal, and CAT relief; however, at his removal hearing, Oshodi was precluded from testifying about these incidents of persecution and torture. After Oshodi began to discuss the first political rally he attended, a precursor to the two events of severe persecution and torture in his declaration, the IJ cut off the direct examination by his attorney. The IJ directed Oshodi to limit his testimony to events not discussed in his asylum application, apparently on the notion that the declaration was sufficient for him to judge the veracity of the events as described therein:
I’ll tell you what. I’ve read the statements of the respondent, read his application. I’ve gone over the materials. I’m not looking for everything to simply be repeated. I mean I understand that there needs to be testimony concerning [the] application, but if you have something to add to what was there, fíne; otherwise, I don’t need it line by line, okay?
Oshodi’s attorney followed the IJ’s directive.[6] As a result, Oshodi did not testify about the key events of persecution and torture that form the foundation of his claims for withholding of removal and CAT relief.
The remainder of Oshodi’s direct testimony was devoted mostly to clarifying a point from the expert’s testimony, that it was his membership in the Unity Party of Nigeria, not NANS, that led to his persecution in 1981. At one point, Oshodi’s attorney again attempted to question him about his encounters with the Nigerian police. As Oshodi began to answer, the IJ interjected, “Counsel, do you have a specific question for the respondent to answer because right now I don’t know what he’s *888 answering.”[7] With that admonishment, Oshodi’s counsel wrapped up his direct examination by asking Oshodi only if he felt he would be safe if he returned to Nigeria or if he could travel within Nigeria to escape the persecution and torture that he feared. Without asking Oshodi any direct questions about his encounters with the Nigerian authorities, Oshodi’s counsel ended his examination: “Nothing further, Your Honor. We submit on the basis of the testimony of the respondent, as well as the documents that are presented.” The entirety of Oshodi’s direct examination covers fewer than ten pages of transcript.
During cross-examination, the government’s attorney asked Oshodi several yes or no questions about the events discussed in his declaration, but did not allow him to explain these events:
Q: And the person who was driving sped through the checkpoint, is that correct, at one point?
A: My application said that.
Q: Is that true? Is that what happened?
A: Yeah, but can you ask me what happened before that?
Q: I’ll ask the questions, please. You went to the checkpoint, is that correct? A: Uh-huh, that’s correct.
Q: You stopped for a bit?
A: Yes, counselor.
Q: Your person behind the wheel got scared and sped off, is that correct?
A: No, that’s wrong.
The government quickly moved on without affording Oshodi the opportunity to elaborate on what actually happened. The IJ had already warned Oshodi to answer the government’s questions directly and not to “expand” on them. The remainder of his testimony did not address the substance of his asylum claim, but focused on peripheral issues related to his credibility, such as the number of his siblings, his failure to apply for asylum earlier, and his prior criminal record.
The IJ recognized that Oshodi’s application, if taken as true, established past persecution. The IJ, however, found Oshodi not credible—without ever hearing Oshodi testify about the events involving his persecution—on the basis of his use of aliases, his failure to provide the corroborating evidence, and various inconsistencies between his testimony, his initial credible-fear interview, and his asylum application. On this basis, he denied Oshodi’s withholding of removal and CAT claims. The BIA affirmed the IJ’s decision and rejected Oshodi’s due process claim that the IJ denied him an opportunity to testify fully in support of his application for relief. The BIA reasoned that there was no due process violation because, following the IJ’s directive limiting Oshodi’s testimony, Oshodi’s attorney asked Oshodi if he had anything to add to his written application and Oshodi briefly testified further about additional, albeit peripheral, details of his application.[8]
ANALYSIS
A.
Unlike challenges to the merits of an IJ’s decision, which we review under *889 the deferential substantial evidence standard, we review de novo due process claims in removal proceedings. See Colmenar v. INS, 210 F.3d 967, 971 (9th Cir.2000). It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings. Id.; see also Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (citing The Japanese Immigrant Case, 189 U.S. 86, 100-01, 23 S.Ct. 611, 47 L.Ed. 721 (1903)). Therefore, every individual in removal proceedings is entitled to a full and fair hearing. Colmenar, 210 F.3d at 971 (citation omitted). A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one’s behalf. Id.; see also Vargas-Hernandez v. Gonzales, 497 F.3d 919, 926-27 (9th Cir.2007) (“Where an alien is given a full and fair opportunity ... to present testimony and other evidence in support of the application, he or she has been provided with due process.”); Shoaira v. Ashcroft, 377 F.3d 837, 842 (8th Cir.2004) (“For a deportation hearing to be fair, an IJ must allow a reasonable opportunity to examine the evidence and present witnesses.”).
Indeed, where an applicant is not represented, the IJ has an affirmative duty to ensure that the record is fully developed for the benefit of the applicant. Jacinto v. INS, 208 F.3d 725, 734 (9th Cir.2000). The statutory and regulatory regime also protects an alien’s right to present evidence and testimony on his behalf in removal proceedings, including his own testimony. 8 U.S.C. § 1229a(b)(4)(B) (“[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien’s own behalf, and to cross-examine witnesses presented by the Government....”); 8 C.F.R. § 1240.1(c) (“The immigration judge shall receive and consider material and relevant evidence.... ”).
 In any contested administrative hearing, admission of a party’s testimony is particularly essential to a full and fair hearing where credibility is a determinative factor, as it was here. Mathews v. Eldridge, 424 U.S. 319, 343-44, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (noting that where credibility and veracity are critical to the decision-making process “written submissions are a wholly unsatisfactory basis for decision” (quoting Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970))). Contrary to this essential aspect of a full and fair hearing, Oshodi was not provided a reasonable opportunity to present evidence on his behalf. In particular, the IJ precluded him from providing critical testimony about the events of persecution that are the foundation of his withholding of removal and CAT claims. Oshodi’s declaration relates that he was subjected to brutal torture, including detention without food, severe beatings, sodomy, and a gun shot to his foot. He claims that he was stripped naked, doused with gasoline, and threatened with being burned alive. But he testified to none of those things because of the IJ’s directive. Instead, the testimony circled around peripheral issues such as his relationship with his estranged father and the number of his siblings and half-siblings. On this record, the IJ determined that Oshodi was not credible and thus the events related in his declaration should be deemed not credible as well.
The importance of an asylum or withholding applicant’s testimony cannot be overstated, and the fact that Oshodi submitted a written declaration outlining the facts of his persecution is no response to the IJ’s refusal to hear his testimony. An applicant’s testimony of past persecution and/or his fear of future persecution stands at the center of his claim and can, if credible, support an eligibility finding *890 without further corroboration. 8 U.S.C. § 1158(b)(l)(B)(ii); 8 C.F.R. § 1208.13(a). Every asylum and withholding applicant is required to be examined under oath as to the contents of his application. 8 C.F.R. § 1240.11(c)(3)(in).
The BIA has held that it is reversible error for an IJ to adjudicate an alien’s application for asylum and withholding of removal without at least placing the applicant under oath and questioning him “as to whether the information in the written application is complete and correct.” Matter of Fefe, 20 I. & N. Dec. 116, 118 (BIA 1989). Moreover, the BIA explained that in nearly all cases, a more in-depth oral examination of the asylum applicant is pivotal to a fair asylum proceeding: “In the ordinary course ... we consider the full examination of an applicant to be an essential aspect of the asylum adjudication process for reasons related to fairness to the parties and to the integrity of the asylum process itself.” Id. The BIA stressed the importance of a full examination in addition to a written application: “It is difficult for an alien to satisfy [the asylum] standard unless he presents testimony at his hearing which is consistent with and corroborates any previous written statements in his [application].” Id.
Thus, by refusing to allow Oshodi to testify to the contents of his written application, the IJ violated Oshodi’s due process right to present oral testimony about the events at the heart of his claim for withholding of removal, testimonial evidence that the BIA has recognized is central to the “integrity of the asylum process itself.” Id. The foregoing was precisely our holding in Colmenar, 210 F.3d at 971-72. In that case, as in this one, the IJ “refused to let Colmenar testify about anything that was included in his written application.” Id. at 971. We held that the “IJ’s conduct was directly contrary to the BIA’s decision in Matter of Fefe ” and found that the IJ improperly precluded Colmenar from presenting evidence on his behalf, in violation of due process. Id. at 971-72.
We similarly found a due process violation in Zolotukhin v. Gonzales, 417 F.3d 1073, 1075-76 (9th Cir.2005), where the IJ “denfied] Zolotukhin a full and fair opportunity to present evidence on his behalf’ by cutting off Zolotukhin’s testimony about his family’s past persecution in Russia and refusing to admit testimony of family members and an expert. On other occasions, we have found a due process violation where the IJ did not exclude any of the applicant’s testimony—which, as established above, has special significance—but excluded other expert or corroborating testimony. See Lopez-Umanzor v. Gonzales, 405 F.3d 1049, 1057-58 (9th Cir.2005) (holding that the IJ’s refusal to hear petitioner’s experts’ testimony violated due process); Kaur v. Ashcroft, 388 F.3d 734, 737-38 (9th Cir.2004) (holding that the IJ’s exclusion of petitioner’s son’s testimony violated due process). The critical question is “[w]hether the IJ’s actions prevented the introduction of significant testimony.” Lopez-Umanzor, 405 F.3d at 1056. The answer here is clearly yes.[9]
The basic premise that applicants for asylum and withholding of removal have a due process right to testify fully as to the merits of their application is not unique to our circuit. In Kerciku v. INS, 314 F.3d 913, 918 (7th Cir.2003) (per curiam), the Seventh Circuit made clear that when the IJ “bar[s] complete chunks of oral testimo *891 ny that would support the applicant’s claims,” he violates the applicant’s due process rights. See also Rodriguez Galicia v. Gonzales, 422 F.3d 529, 539-40 (7th Cir.2005) (concluding that the applicant was denied due process when the IJ not only repeatedly interrupted the applicant during her testimony but also prevented her from presenting expert testimony); Podio v. INS, 153 F.3d 506, 510-11 (7th Cir.1998) (holding that the IJ violated applicant’s due process rights by refusing to allow him to testify fully and excluding corroborating testimony).[10] In Kerciku, the IJ cut off Kerciku’s direct testimony after he had testified only to a few peripheral issues. Thus, the IJ improperly “barfred] complete chunks of [his] oral testimony.” 314 F.3d at 918. This was true even though Kerciku filed a written application outlining his asylum claim in detail. Id. at 915-16. By barring any testimony repetitive of Oshodi’s written application, the IJ improperly “barfred] complete chunks of [his] oral testimony” that would have supported his claim. See id. at 918.
The IJ’s refusal to hear Oshodi’s full testimony with respect to the abuses he suffered in Nigeria is particularly unacceptable given that the basis for the IJ’s denial of relief rested solely on an adverse credibility finding. In making a credibility determination, the IJ is to consider the “totality of the circumstances,” including:
[T]he demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant’s or witness’s account, the consistency between the applicant’s or witness’s written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant’s claim, or any other relevant factor.
8 U.S.C. § 1158(b)(l)(B)(iii). Where, as here, the IJ does not allow the applicant to testify fully as to the merits of his application, the IJ’s ability to make a credibility determination based on the above factors is severely hampered. The IJ did not have the opportunity to judge Oshodi’s “demeanor, candor, or responsiveness” while testifying about the events of persecution and torture that he experienced, nor did the IJ have the ability to compare for consistency his oral presentation of those events to the way he described them in his written declaration. See id.
The importance of live testimony to a credibility determination is well recognized and longstanding. See, e.g., United States v. Thoms, 684 F.3d 893, 903 (9th Cir.2012) (“The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system.”); United States v. Mejia, 69 F.3d 309, 315 (9th Cir.1995) (“There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness’s credibility.”); see also United *892 States v. 1998 BMW “I” Convertible, 235 F.3d 397, 400 (8th Cir.2000) (“[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses’ demeanor to best ascertain their veracity—or lack thereof.”). Precisely because of the importance of live testimony to credibility determinations, we have held, as a matter of constitutional due process, that when a magistrate judge makes a report and recommendation on a motion to suppress evidence, the district judge may not reject the magistrate judge’s credibility findings without conducting his own evi-dentiary hearing. United States v. Ridg-way, 300 F.3d 1153, 1157 (9th Cir.2002). We also applied this rule to magistrate judges’ credibility determinations in habe-as Batson claims. Johnson v. Finn, 665 F.3d 1063, 1075-76 (9th Cir.2011). In so holding, we explained that this requirement ensures that any factual determination “will be the result of first-hand observations of witnesses and evidence.” Id. at 1072.
Indeed, the rationale behind the substantial deference we give to agency credibility determinations is that IJs “are in the best position to assess demeanor and other credibility cues that we cannot readily access on review.” Shrestha v. Holder, 590 F.3d 1034, 1041 (9th Cir.2010); see also H.R.Rep. No. 109-72, at 167 (Conf. Rep. on REAL ID Act of 2005) (“An immigration judge alone is in a position to observe an alien’s tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He [or she] is, by virtue of his [or her] acquired skill, uniquely qualified to decide whether an alien’s testimony has about it the ring of truth.” (quoting Sarvia-Quintanilla v. INS, 767 F.2d 1387, 1395 (9th Cir.1985))). We defer to a trial court’s credibility determinations for the same reason. See Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court’s findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding of and belief in what is said.”).[11]
In light of the foregoing, it makes sense that the only exception the BIA has recognized to its general rule that an applicant for asylum or withholding of removal should be fully examined on his application is when both parties stipulate that the testimony would be both consistent with the written statement and believable. Matter of Fefe, 20 I. & N. Dec. at 118. There was no such stipulation in this case, and the IJ did not find Oshodi’s declaration believable.
By precluding Oshodi from testifying about the critical events in his application, *893 the IJ short-circuited his ability to judge accurately Oshodi’s credibility. To do so properly, he must consider the “totality of the circumstances,” yet here, the IJ restricted the evidence, especially the evidence most relevant to credibility, such as demeanor and the consistency of testimony. Without hearing Oshodi’s testimony about the persecution he suffered in Nigeria, and judging his demeanor and consistency during that testimony, the IJ determined that Oshodi was not credible and therefore that the contents of Oshodi’s written declaration should not be credited. In doing so, the IJ improperly “prejudg[ed] ... the [ ] ‘credibility or the probative value’ ” of that testimony. Lopez-Umanzor, 405 F.3d at 1056 (quoting Kaur, 388 F.3d at 737).
In Shrestha, we held that “an IJ [must] not cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result.” 590 F.3d at 1040. Here, however, the IJ paid little heed to the principle recognized in Shrestha. Although the IJ had the benefit of the government’s cross-examination of Oshodi regarding the alleged inconsistencies in his application and other factors weighing against his credibility, the IJ did not have the benefit of Oshodi’s testimony regarding the central events underlying his' application. The IJ was unable to judge Oshodi’s demeanor and the nature of his testimony while he testified about the events of his persecution, the veracity of which were critical to the merits of his application. The IJ cannot avoid considering all relevant factors and evidence in making a credibility determination by refusing to hear significant evidence in the first place. See id. (“[An] IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole.” (quoting Hanaj v. Gonzales, 446 F.3d 694, 700 (7th Cir.2006))).
Despite the forgoing, the BIA rejected Oshodi’s due process claim because, after the IJ’s directive not to testify to the contents of his declaration, Oshodi’s attorney asked him if he had anything further to add, and Oshodi testified to a few additional details. Oshodi’s attorney, however, phrased his questions to Oshodi to comply ■with the IJ’s directive and avoided eliciting testimony regarding the events discussed in his application: “Is there anything that you would like to add in addition to what was already previously submitted in your asylum application and your statement that you submitted to the Court?” In response, Oshodi reasonably avoided testifying about the events described in his application and used that opportunity only to clarify a detail discussed in his expert witness’s testimony. At no point did the IJ modify or reconsider his earlier directive and affirmatively allow Oshodi to testify about the contents of his application.
Thus, although Oshodi’s attorney elicited some additional testimony outside the scope of the restrictions imposed by the IJ, Oshodi was still precluded from testifying about the events described in his application. The end result of the IJ’s restriction on Oshodi’s testimony was that it “prevented the introduction of significant testimony,” Lopez-Umanzor, 405 F.3d at 1056, that was critical to the merits of his application. In Colmenar, which presented a very similar factual scenario, we rejected the BIA’s reasoning in this case. 210 F.3d at 972. The IJ cut off Colme-nar’s direct testimony but, at the close of his testimony, the government attorney and IJ asked him if he had anything to add. Id. We found those cursory questions insufficient to cure the IJ’s previous refusal to allow Colmenar to testify to the contents of his written application. Id. That Oshodi testified to some facts regard *894 ing his application after the IJ’s instruction does not cure the IJ’s refusal to admit testimony on the most significant events underlying Oshodi’s withholding of removal and CAT claims—testimony which was critical to the IJ’s credibility analysis.
B.
The dissent faults our due process analysis for failing to begin by conducting the balancing test outlined in Mathews v. Eldridge. The dissent, however, skips over the fact that our circuit, as well as other circuits, has already determined that a due process right to present oral testimony in asylum cases exists, especially in cases that hinge on credibility. See, e.g., Colmenar, 210 F.3d at 971-72; Kerciku v. INS, 314 F.3d at 918. Nonetheless, a Mathews analysis only supports our conclusion. Under Mathews, we determine what process is due by balancing (1) the private interest at stake, (2) “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional ... safeguards,” and (3) the government’s interest, including the burdens of any additional process. 424 U.S. at 335, 96 S.Ct. 893.
The first factor weighs heavily in Oshodi’s favor. We have consistently recognized that deportation is a “particularly severe penalty.” Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473, 1481, 176 L.Ed.2d 284 (2010) (internal quotation marks omitted); see also Landon v. Plasencia, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (“Plasencia’s interest here is, without question, a weighty one. She stands to lose the right to stay and live and work in this land of freedom. Further, she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual.”) (internal quotation marks and citation omitted). In the case of an asylum and withholding of removal applicant, the private interest could hardly be greater. If the court errs, the consequences for the applicant could be severe persecution, torture, or even death. INS v. Cardoza-Fonseca, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (“Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country.”).
The second factor in the Mathews balancing test is the adequacy of the challenged procedure: in this case, the denial of an asylum applicant’s ability to testify about the contents of his asylum and withholding application when the merits of his case hinges on his credibility. This factor also weighs in Oshodi’s favor. The dissent relies heavily upon FDIC v. Mallen, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), to support its argument that oral testimony was not required in this case. Dissent at 901-02. Mallen, however, is entirely consistent with our holding that due process entails a right to present oral testimony in asylum and withholding cases that turn on credibility determinations. In Mallen, the plaintiff brought a due process challenge to a statute that did not provide for an unfettered right to oral testimony in a different setting altogether, a post-suspension hearing on an FDIC decision to suspend from office an indicted official of a federally insured bank. Id. at 232, 108 S.Ct. 1780. In rejecting the challenge, the Court explicitly assumed that due process would sometimes require oral testimony:
[W]e may assume that there are post-suspension proceedings under § 1818(g) in which oral testimony is essential to enable the hearing officer to make a fair appraisal of the impact of a suspended officer’s continued service on the bank’s security and reputation.
*895 Id. at 247, 108 S.Ct. 1780. The Court rejected the facial challenge to the statute on the narrow ground that the hearing officer should have been given the opportunity to decide whether to hear oral testimony in that case. Id. The Court concluded that the officer may have decided to hear the testimony, or may have properly rejected it as unnecessary under the circumstances of that case. Id.
We agree that Mallen stands for the proposition that oral testimony is not always required in administrative proceedings. Id. at 247-48, 108 S.Ct. 1780; Dissent at 902. But such an unsurprising holding is of little consequence here. Indeed, this proposition is established by Mathews. 424 U.S. at 349, 96 S.Ct. 893. Mallen also unremarkably suggests that, in some administrative proceedings and under certain circumstances, the fact that the material was “adequately covered by the written submissions” might be a valid reason for denying oral testimony. 486 U.S. at 247, 108 S.Ct. 1780. But Mallen also stands for the proposition that, in some cases, due process likely requires the admission of oral testimony. Id. It is our task, under Mathews, to determine what process is due in an asylum and withholding hearing, where credibility is a paramount consideration. The Court’s holding that oral testimony may not be required in every post-suspension hearing of a bank official is not at all inconsistent with our holding today that due process requires the admission of oral testimony in an asylum and withholding hearing wherein the applicant’s eligibility for relief turns on his credibility.
In determining whether oral testimony should be required in any particular case, we must consider “the risk of an erroneous deprivation of [the private interest] through the procedures used, and the probable, value, if any, of additional ... safeguards.” Mathews, 424 U.S. at 335, 96 S.Ct. 893. Mathews provides guidance for when oral testimony is valuable under this prong: the touchstone is, unsurprisingly, the importance of credibility determinations to the type of case presented. In Mathews, the Court explained that an evi-dentiary hearing complete with oral testimony was not required before the termination of disability benefits because such cases primarily turn on “routine, standard, and unbiased medical reports by physician specialists” and, therefore, ordinarily “the specter of questionable credibility and veracity is not present.” Id. at 344, 96 S.Ct. 893 (internal quotation marks omitted).[12] Credibility was the key distinction between Mathews and Goldberg, a case where the Court found that due process required an evidentiary hearing and the admission of oral testimony before welfare benefits could be terminated. Mathews explained:
Central to the evaluation of any administrative process is the nature of the relevant inquiry.... In the [welfare cases], a'wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decisionmaking process. Goldberg noted that in such circum *896 stances “written submissions are a wholly unsatisfactory basis for decision.”
Mathews, 424 U.S. at 343-44, 96 S.Ct. 893 (quoting Goldberg, 397 U.S. at 269, 90 S.Ct. 1011). Therefore, Mathews teaches us that cases that hinge on credibility are precisely the types of cases where the probable value of oral testimony is high and the lack of oral testimony significantly raises the risk of an erroneous decision.[13] Therefore, the second Mathews factor weighs in favor of requiring oral testimony in asylum cases, which often turn solely on credibility determinations.[14]
The final Mathews factor requires us to consider the burdens our holding may place on the administrative process. The burden here is minimal since we only require that IJs follow the governing rules and regulations. As discussed above, Matter of Fefe requires testimony by an asylum applicant in each case and requires “the full examination of an applicant” except in the exceptional case where the parties stipulate that “the applicant’s testimony would be entirely consistent with the written materials and that the oral statement would be believably presented.” 20 I. & N. Dec. at 118. In short, we require no process that the government has not already imposed on itself.
In sum, we conclude that a Mathews analysis clearly supports our conclusion that due process entails the right to present oral testimony in asylum and withholding cases that turn upon an applicant’s credibility.
C.
To prevail on his due process claim, Oshodi must also show prejudice. Colmenar, 210 F.3d at 971. To show prejudice Oshodi need only demonstrate “that the outcome of the proceeding may have been affected by the alleged violation.” Zolotukhin, 417 F.3d at 1076 (emphasis in original) (quoting Lopez-Umanzor, 405 F.3d at 1058). Here, the outcome turned entirely *897 on Oshodi’s credibility. The IJ recognized that Oshodi’s application, if believed, demonstrated past persecution. Given the importance of an applicant’s live testimony to an IJ’s credibility determination, supra, it follows that the IJ’s failure to allow Oshodi to testify about the persecution he described in his application may have influenced his adverse credibility decision. Oshodi’s “testimony could have been so compelling and consistent that it would have altered the judge’s initial credibility determination.” Kerciku, 314 F.3d at 919.
A finding of prejudice is further supported by a close examination of the IJ’s decision in this case. The IJ’s decision relied heavily on Oshodi’s testimony and gave little to no credence to the contents of his declaration. He dedicates three full pages to outlining all of Oshodi’s testimony, which primarily consisted of the government’s cross-examination. With respect to the two primary events of past persecution at the foundation of Oshodi’s claim, the IJ devoted one paragraph. Moreover, the IJ appears to have minimized the importance of these events to Oshodi’s claim because he testified to them only briefly: “The respondent testified briefly about two other incidents that involved persecution by Nigerian officials.” Of course, the reason Oshodi only testified briefly about these events was that the IJ instructed him not to testily about them at all. The IJ also incorrectly discredited these events because “[t]he respondent failed to include these incidents on his application for asylum, but submitted into evidence a separate affidavit describing each in some detail.” In fact, Oshodi did mention both of these events with some specificity in his application and then refers the reader to an attached declaration discussing the events in even greater detail. Because the IJ cut off Oshodi’s testimony early in the hearing, the only evidence of the significant events of past persecution was in his application and attached declaration. The IJ, however, gave that evidence little weight, focusing instead on the content of Oshodi’s limited testimony. On this record, Oshodi has clearly met his burden to demonstrate that his inability to fully testify may have affected the outcome of his case. See Zolotukhin, 417 F.3d at 1076.[15]
CONCLUSION
As we stated in Colmenar, “[w]e do not enjoy second-guessing the way Immigra *898 tion Judges run their courtrooms,” but it is imperative that asylum and withholding claims are heard “fully and fairly” before we make a judgment on the merits. 210 F.3d at 973. “This is consistent with our role as judges, and the values of our Constitution demand no less.” Id. We reaffirm our holding, and the BIA’s own rule, that an applicant’s oral testimony is “an essential aspect of the asylum adjudication process” and the refusal to hear that testimony is a violation of due process. Matter of Fefe, 20 I. & N. Dec. at 118; see also Colmenar, 210 F.3d at 972. The petition for review is granted and the case is remanded for a new hearing before an IJ.
PETITION GRANTED in part and REMANDED.
Dissent by Chief Judge KOZINSKI.

. Oshodi does not challenge the denial of his asylum application as untimely.

. Oshodi is ineligible for adjustment of status through these relationships because an adjustment petition was not filed until 2005 and *886 Oshodi entered the United States without inspection. INA § 245(i), 8 U.S.C. § 1255(i).

. Oshodi offered his mother's death certificate as corroborating evidence of this claim but the IJ refused to admit it as not properly authenticated.

. At the time of Oshodi's hearing, General Obasanjo was campaigning for a third term as President.

. In addition to his declaration, Oshodi offered into evidence police reports regarding both events of persecution and medical records from Nigeria confirming that he suffered a gunshot wound and other injuries after the second event. The IJ refused to admit these documents as not properly authenticated. A forensic medical report prepared in the United States and a newspaper article directly referring to Oshodi’s persecution at the airport were entered into evidence but were not addressed by the BIA in its decision.

. We respectfully disagree with the dissent’s characterization of the IJ’s statement as a "tame exhortation,” “encouragfing]” Osho-di’s lawyer to "[mjove it along, counselor.” Dissent at 898, 898, 899. The dissent argues that, the phrase "I don’t need it line by line, okay?” somehow makes it clear that the IJ intended to allow some repetitive testimony. Dissent at 899. Indeed, the dissent goes on to state that "[njothing the IJ said precluded Oshodi from giving a vivid oral account of the incidents of persecution he allegedly suffered.” Dissent at 899. We disagree. To the contrary, it was only when Oshodi began to give a "vivid oral account” of his persecution that the IJ intervened in the presentation of Oshodi’s testimony.
The IJ admonished Oshodi and his lawyer that "if you have something to add to what was there, fine; otherwise I don't need it line by line, okay?” We read this statement as instructing Oshodi’s lawyer not to elicit testimony about matters already covered in the application. Oshodi's lawyer clearly understood the directive in this manner as well. Before the IJ’s directive, Oshodi’s lawyer was asking Oshodi a series of chronological questions about Oshodi’s persecution in Nigeria. After the IJ intervened, Oshodi’s lawyer stopped this line of questioning and only asked Oshodi if he had anything to say "in addition to what was already previously submitted in [his] application and [his] statement.” Oshodi’s lawyer plainly did not understand the IJ’s directive as merely a request for Oshodi not to repeat himself “line by line” but rather an instruction to elicit testimony only about events not included in the application. We understand it in the same way.

. The dissent takes issue with our characterization of this exchange. The full exchange is replicated in the dissent. Dissent at 899-900. We do not claim that this exchange alone would suggest that the IJ barred any of Osho-di’s testimony. Rather, we note this exchange to highlight the fact that Oshodi never actually testified to the events of his persecution.

. Pursuant to the parties’ stipulation, Osho-di's initial petition for review was remanded to the BIA for consideration of the impact of the REAL ID Act on the corroboration and credibility issues in this case. On remand, the BIA reaffirmed its previous decision.

. Nothing in our decision curtails the IJ's ordinary discretion to limit testimony in order to “focus the proceedings and exclude irrelevant evidence.’’ Kerciku v. INS, 314 F.3d 913, 918 (7th Cir.2003). The IJ simply cannot do so in a wholesale manner that precludes the applicant from fully and fairly testifying as to the contents of his application.

. The Third Circuit reached a similar conclusion in a case where the IJ improperly excluded evidence during a removal proceeding. See Cham v. Att’y Gen., 445 F.3d 683, 694 (3d Cir.2006) (holding that the IJ denied applicant due process because, inter alia, he refused to consider corroborating evidence and refused to continue the hearing in order to allow the testimony of additional witnesses).

. The dissent faults our reliance on Anderson, claiming that it does not stand "for the proposition that special deference is owed a trial court’s credibility determination because it is best able to evaluate demeanor during live testimony” but rather stands for the "contrary position.” Dissent at 904. We recognize that the Court stated that “the rationale for deference to the original finder of fact is not limited to the superiority of the trial judge’s position to make determinations of credibility.” Anderson, 470 U.S. at 574, 105 S.Ct. 1504 (emphasis added). True enough. But it then said that appellate courts owe "even greater deference” when findings are based on credibility determinations. Id. at 575, 105 S.Ct. 1504. Try as it might, the dissent simply cannot refute the clear and repeated holdings of the Court that live testimony is critical to credibility matters. Anderson's indication that we owe deference to triad courts for other reasons is of no consequence.

. The administrative procedure in Mathews granted disability candidates the right to a full evidentiary hearing post-termination of disability benefits. 424 U.S. at 339, 96 S.Ct. 893. Eldridge's claim was that due process required an evidentiary hearing before the government terminated benefits even where there was a right to a post-deprivation eviden-tiary hearing. The framework also allowed for retroactive benefits in cases where the disability recipient proved continuing eligibility for benefits at the evidentiary hearing or at any later stage in the review proceedings. Id. If Oshodi is removed, he will have no further opportunity to challenge the IJ’s determination.

. The dissent cites to Mackey v. Montrym, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) to suggest that this is “a lesson the Supreme Court has not yet learned.” Dissent at 904. But Mackey was a case about whether a state was required to provide for a pre-deprivation hearing before suspending an individual’s driver's license. The statutory scheme gave the individual the right to a full evidentiary hearing post-deprivation. Thus, it does not at all address whether an individual has a right to live testimony in cases involving credibility determinations. Indeed, the Court recognized that an evidentiary hearing, although post-deprivation, would be the "necessary” place to "resolve questions of credibility or conflicts in the evidence.” Id. at 15, 99 S.Ct. 2612.

. The dissent argues that, in determining credibility, "the ability to present live direct testimony during a removal proceeding strikes [the dissent] as relatively unimportant,” and bases the second factor analysis on that proposition. Dissent at 905. Although it may strike the dissent as relatively unimportant, the importance of live testimony is well-established in Supreme Court and Ninth Circuit jurisprudence, supra. 891-93, 895-96. Indeed, we accord IJs significant deference based, at least in part, upon the assumption that the ability to observe live testimony matters a great deal, supra 891-92.
The dissent also cites Apouviepseakoda v. Gonzales, 475 F.3d 881, 897 (7th Cir.2007) (Posner, J., dissenting), wherein Judge Pos-ner, in dissent, questioned the value of live testimony to credibility determinations where such testimony is presented through an interpreter. Dissent at 905. Judge Posner’s views, regardless of their merit, are not relevant here where there was no interpreter. We doubt that Judge Posner's critique applies not only to those who testify through interpreters but also to those who "simply grew up in a different culture.” Dissent at 905-06. The possible cultural obstacles the dissent cites are not an excuse for depriving petitioners the right to present their own story in their own words. Because Oshodi testified in English, and not through an interpreter, the views of Judge Posner, as echoed by the dissent, are of no import here.

. The dissent merely repeats the IJ’s credibility determination and then concludes that Oshodi cannot prevail under the prejudice prong because the IJ's credibility determination was, the dissent believes, well-supported. Because the IJ will have to conduct a new hearing, we do not reach the merits of the credibility finding. We note, however, that the credibility determination is not as ironclad as the dissent suggests. We observe that the credibility finding was based exclusively on the purported inconsistencies in Oshodi's testimony and gave no weight to significant corroborating evidence that went to the heart of his claim, in particular a newspaper article discussing Oshodi and a medical report describing fourteen separate scars or chronic conditions he suffers from that are consistent with his story. Instead, the IJ found a lack of credibility without considering that evidence and then discounted the evidence because of the credibility finding. On remand, the IJ must consider the totality of the circumstances, including the “consistency of [Osho-di's] statements with other evidence of record” when determining credibility. 8 U.S.C. § 1158(b)(l)(B)(iii). As we have explained, "an IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole.” Shrestha v. Holder, 590 F.3d 1034, 1040 (9th Cir.2010).
Unlike the dissent, we do not presume to decide that an IJ, once noting some inconsistencies in the record, could not still find an applicant credible based on persuasive testimony. It is not inconceivable that a man with a criminal background could also face severe persecution in his home country.